1
2
3
4
5          IN THE UNITED STATES BANKRUPTCY COURT
6              FOR THE DISTRICT OF ARIZONA
7
8                                          | Chapter 11
9   In re DENNIS EKSTROM,                  | Case No. 08-07750-SSC
10                                         | (Not for Publication- Electronic Docketing ONLY)
11
12                          Debtor.        | MEMORANDUM DECISION RE CONTESTED HEARING ON CONFIRMATION OF THE DEBTOR'S PLAN
13
14
15               I. PRELIMINARY STATEMENT
16          This Court completed a contested hearing on confirmation of the Debtor's Plan of

17  Reorganization on October 26, 2009.  After the close of evidence, the Debtor filed a Revised

18  Stipulation with the Internal Revenue Service ("IRS") on November 6, 2009.[1]  The parties filed

19  post-trial memoranda of law on November 25, 2009, at which point this matter was deemed

20  under advisement.

21          In this Memorandum Decision, the Court has set forth its findings of fact and

22  conclusions of law pursuant to Rule 7052 of the Rules of Bankruptcy Procedure.  The issues

23  addressed herein constitute a core proceeding over which this Court has jurisdiction.  28 U.S.C.

24  §§ 1334(b) and 157(b) (West 2009).

25
26  _____
27      **1.** Docket Entry No. 232.
28                                    1

1. The Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code on June 26, 2008 (the "Petition Date") initiating the above-captioned case in this Court.[2]

2. On June 17, 2005, FL Receivables obtained a Judgment in Oklahoma state court against the Debtor and his partner, Reza Ghaanati.  This Judgment is also against Alden, Inc., Newden, Inc., Rezden, Inc., Denden, Inc. and Kayden, Inc. (collectively, the "FL Judgment Entities") that operated certain Denny's restaurants in Oklahoma and Missouri.  This Judgment was in the aggregate principal amount of $4,076,612.96.

3. FL Receivables has filed a proof of claim in this case asserting that, as of the Petition Date, the outstanding amount due under the Judgment was at least $4,336,410.36.

4. On July 16, 2008, the Internal Revenue Service ("IRS") filed a proof of claim in this case in the total amount of $802,613.02.  Of this amount, IRS claimed $443,416.48 was a priority unsecured claim under Bankruptcy Code § 507(a)(8) and $359,196.54 was secured.

5. On July 21, 2008, the Oklahoma Tax Commission ("OTC") filed a proof of claim in the total amount of $337,330.18, of which the taxing authority claimed $289,513.42 was a priority unsecured claim.

6. The Debtor's residence is located at 12197 East Poinsettia Drive, Scottsdale, AZ (the "Residence").  The Residence is subject to two mortgages.  The first mortgage is held by Amtrust Bank; and as of the Petition Date, the sum of $625,674.09 was due and owing on the Amtrust Bank mortgage.  The second mortgage is held by Countrywide; and as of the Petition Date, the sum of $200,000 was due and owing on the Countrywide mortgage.

7. In his Schedule C, the Debtor has claimed a homestead exemption in the Residence under A.R.S. § 33-1101A in the amount of $150,000.  There has not been any

---

**2.**  The Bankruptcy Abuse Prevention And Consumer Protection Act of 2005 ("BAPCPA")(Pub.L.No. 109-8, §1501(b)(1), 119 Stat. 23, 216) is applicable to this case.

objection to this claimed exemption.

8. The Debtor claims an equitable interest in a single family residence located at 5906 Arroyo Way in Pine, AZ (the "Pine House"). Legal title to the Pine House is held by the Ekstrom Family Limited Partnership. The Pine House is subject to two mortgages. The first mortgage is held by First Magnus Financial; and as of the Petition Date, the sum of $117,705.06 was due and owing on the First Magnus/Countrywide mortgage. The second mortgage is held by Wells Fargo; and as of the Petition Date, the sum of $69,859.49 was due and owing on the Wells Fargo mortgage.

9. The Ekstrom Family Limited Partnership was formed in 2003. At the time it was formed, the Debtor received a 49.5 percent limited partnership interest in this partnership. The Debtor's wife also received a 49.5 percent limited partnership interest. The Debtor transferred his limited partnership interest to the Dennis Ekstrom Living Trust.

10. A 1 percent general partnership interest in the Ekstrom Family Limited Partnership is held by Standard Management LLC, an Arizona limited liability company. The Debtor's wife is the sole member and manager of Standard Management LLC.

11. The Debtor claims a equitable interest in a residence/bed and breakfast located at 189 E. Main Street in Lava Hot Springs, ID (the "Idaho Property"). Legal title to the Idaho Property is held by EZ Livin' Inn, LLC, an Idaho limited liability company. The Idaho Property is subject to two mortgages held by Ireland Bank. As of the Petition Date, the sum of $97,464.47 was due and owing on the first mortgage. As of the Petition Date, the sum of $38,318.97 was due and owing on the second mortgage.

12. The membership interests in EZ Livin' Inn LLC were originally held by the Debtor, his wife and Standard Management, LLC. The Debtor's membership interest was conveyed to the Ekstrom Family Limited Partnership. The Debtor's interest in the Ekstrom

3

1    Family Limited Partnership was contributed to the Dennis Ekstrom Living Trust.[3]

2            13. On his Schedule B, the Debtor lists the value of his interest in the EZ Livin'
3    Inn LLC at "0.00."[4]

4            14.  The Debtor claims an equitable interest in a residential property located at
5    10870 E. Yucca in Scottsdale, AZ (the "Yucca Property").  Legal title to the Yucca Property is
6    held by the Ekstrom Family Limited Partnership.  The Yucca Property is subject to a mortgage
7    held by Wells Fargo.  As of the Petition Date, the sum of $137,997.97 was due and owing on the
8    Wells Fargo mortgage.

9            15. In his Schedule B, the Debtor claims to own a life insurance policy with ING.
10   In his Schedule C, the Debtor claimed the proceeds of this policy were exempt under A.R.S. §
11   20-2231.  There has not been any objection to this claimed exemption.

12           16. In his Schedule B, the Debtor claims to own a 401k plan through Merrill
13   Lynch.  In his Schedule C, the Debtor has claimed his 401k plan as exempt under A.R.S. §
14   33-1126B.   There has not been any objection to this claimed exemption.

15           17. In his Schedule B, the Debtor lists his interests in the FL Judgment Entities.
16   The Debtor's interest in the FL Judgment Entities has no value.

17           18. In his Schedule B, the Debtor lists a 50 percent in DR Property Investments
18   LLC.  This interest is held by the Ekstrom Family Limited Partnership.  This 50 percent interest
19   in DR Properties LLC has no value.[5]

20           19. In his Schedule B, the Debtor lists a 10 percent shareholder interest in QK,

21

22   _____

23       **3.** See October 26, 2009 Trial Transcript at 130.  The Court has rephrased what the
     parties placed in the Amended Joint Pretrial Statement, Docket Entry No. 219, at 2, ¶12, to have
24   it be consistent with the evidence presented.

25       **4.** See Amended Schedule B, Docket Entry No. 53. Also Exhibit No. S.

26       **5.** This parties' agreed upon fact is not consistent with the Debtor's Schedules.  The
     name of the entity is apparently DR Properties LLC, Oklahoma.  See Schedule B, Docket Entry
27   No. 18 and Amended Schedule B, Docket Entry No. 53.

28                                              4

New Mex, Inc.  This shareholder interest has no value.

20. The Court concludes that the Finding of Fact, which states "In his Schedule B, the Debtor lists a 10 percent ownership interest in DRD Properties LLC, New Mexico.  The Debtor has valued this ownership interest at $8,000 on his Schedule B." is in error.  The Debtor's Schedule B states instead that he has a 10 percent ownership interest in "DRD Properties, New Mexico," which owns and operates a Del Taco restaurant on a piece of real property in New Mexico, and which ownership interest the Debtor believes has a value of $8,000.

21. In his Schedule B, the Debtor lists a 50 percent ownership interest in 635 LLC.  This ownership interest is held by the Ekstrom Family Limited Partnership.  This ownership interest has no value.

22. In his Schedule B, the Debtor lists a 33 percent ownership interest in DRD Northwest LLC.  Debtor valued his ownership interest at $150,000 on his Schedule B.

23. The Debtor owns a 50 percent interest in 9.5 acres of vacant land in Pauls Valley, OK.  On his Schedule A, the Debtor has valued his interest in this property at $100,000.  This property is fully encumbered by a lien held by FL Receivables and has no equity.

24. On April 1, 2003, the Debtor executed a Promissory Note payable to QK, Inc. in the principal amount of $137,000 with interest accruing at the rate of 9 percent per annum.  According to the terms of the Promissory Note, the principal and all accrued, but unpaid, interest is due within 30 days after written demand by QK, Inc.

25. To secure his obligations under the April 1, 2003 Promissory Note, the Debtor executed a Security Agreement, also dated April 1, 2003, granting QK, Inc. a security interest in the Debtor's ownership interests in QK, New Mex, Inc. and DRD Property Investments LLC.[6]

26. On January 27, 2006, the Debtor executed an Amendment to the April 1, 2003

---

**6.** Also see Exhibits M and N.  However, the Debtor does not list, nor value, DRD Property Investments LLC on his original or Amended Schedules, nor did he testify as to said entity at trial.  It is unclear if this entity still exists. The Court will not take a leap of faith that "DRD Properties, New Mexico" is the same entity as "DRD Property Investments LLC."

Security Agreement.  In this Amendment, the Debtor granted QK, Inc. a security interest in his ownership interest in DRD Northwest LLC.  According to the Amendment, this security interest was given to further secure the Debtor's obligations under the April 1, 2003 Note, as well as to secure repayment of certain additional advances made by QK, Inc. to the Debtor after the Note was executed.

27. Other than the collateral described in the Security Agreement and the Amendment, there is no other collateral securing the Debtor's debt to QK, Inc.

28. QK, Inc. filed a UCC financing statement with the Arizona Secretary of State on February 2, 2006.  The collateral described in this financing statement is (a) the Debtor's shares of stock in QK, New Mex, Inc., (b) the Debtor's interest in DRD Property Investments LLC, and (c) the Debtor's interest in DRD Northwest LLC.

29. On January 26, 2009, the Debtor filed an objection to the IRS proof of claim [dkt. 75].

30. On February 12, 2009, the Debtor filed an objection to the OTC proof of claim [dkt. 85].  That objection has not been withdrawn or ruled upon by the Court.

31. On February 9, 2009, the IRS filed an amended proof of claim.  In this amended claim, the IRS asserts a total claim of $770,181.65.  Of this amount, the IRS claims $406,718.15 is a priority unsecured claim, and $359,196.54 is a secured claim.

32. On February 26, 2009, the OTC filed an amended proof of claim.  In this amended claim, the OTC asserted a total claim of $214,951.03, of which $173,293.53 is potentially a priority unsecured claim.

33. On April 1, 2009, the Debtor filed his "Debtor's Amended Plan of Reorganization Dated April 1, 2009" (the "April 1 Plan").[7]

34. On April 2, 2009, the Court entered its Order approving the Debtor's disclosure statement and fixing May 5, 2009 as the last date for filing written acceptances or

---

**7.** Docket Entry No. 114.

6

rejections of the April 1 Plan.[8]

35. On May 5, 2009, FL Receivables timely filed two ballots rejecting the April 1 Plan in Classes 2.I and 3.B.

36. On May 5, 2009, FL Receivables timely filed its "Objection to Plan of Reorganization" (the "Original Objection") to the April 1 Plan.[9]

37. Votes were received in Classes 2.C, 2.E, 2.F, 2.I, 3.A and 3.B. Classes 2.C (Countrywide secured claim), 2.I (FL Receivables secured claim), 3.A (unsecured creditors other than FL Receivables) and 3.B (FL Receivables unsecured claim) voted to reject the April 1 Plan. Classes 2.E and 2.F, representing Ireland Bank's secured claims, voted to accept the April 1 Plan.

38. No ballot was received from the IRS on its secured claim in Class 2.J.

39. On May 19, 2009, the Debtor filed with the Court a "Stipulation Regarding Treatment of IRS Tax Claims" between the Debtor and the IRS (the "IRS Claim Stipulation"). The IRS agreed to accept the treatment of its claims under the plan as set forth in the IRS Claim Stipulation.[10] This Stipulation also contains a motion requesting approval of the Stipulation.

40. On May 21, 2009, the Debtor filed with the Court "Stipulation for Adequate Protection Payments and Plan Treatment" between the Debtor, Ireland Bank and EZ Livin' Inn LLC (the "Bank Stipulation").[11] The Stipulation of the parties sets forth the terms regarding the payment of Ireland Bank's claims and is incorporated into the Plan.

41. The Debtor made payments out of his DIP account to Ireland Bank in July 2008, October 2008, November 2008 and April 2009.

---

**8.** Docket Entry No. 122.

**9.** Docket Entry No. 132.

**10.** Docket Entry No. 152.

**11.** Docket Entry No. 154.

7

1    42. The Debtor never sought or obtained authority from the Court to make these

2    payments to Ireland Bank.

3    43. Ireland Bank filed a secured Proof of Claim on August 8, 2008 in the amount

4    of $97,464.47, plus accrued interest, costs and fees asserting a first lien security interest in

5    certain real property located in Lava Hot Springs, Idaho (the "Idaho Property") pursuant to a

6    Real Estate Deed of Trust and  an Assignment of Leases and Rents, jointly recorded on

7    November 3, 2004 in the official records of the Bannock County Recorder, Bannock County,

8    Idaho.

9    44. Ireland Bank filed a secured Proof of Claim on August 8, 2008 in the amount

10   of $38,318.97, plus accrued interest, costs and fees asserting a second lien security interest in

11   certain real property located in Lava Hot Springs, Idaho (the "Idaho Property") pursuant to a

12   Real Estate Deed of Trust and  an Assignment of Leases and Rents, jointly recorded on

13   November 3, 2004 in the official records of the Bannock County Recorder, Bannock County,

14   Idaho.

15   45. On June 8, 2009, the Debtor filed his "Debtor's Amended Plan of

16   Reorganization Dated June 8, 2009" (the "Plan").[12]

17   46. On June 25, 2009, FL Receivables timely filed its "Objection to Plan of

18   Reorganization" (the "Supplemental Objection") to the Plan.[13]

19   47. On August 21, 2009, the Debtor filed a "Stipulation Regarding Treatment of

20   First Magnus/Countrywide Claim (Class 2.C)".[14]

21   48. The Debtor filed a "Motion to Accept Late Filed Ballot of QK, Inc. and Take

22

23

24   _____

25   **12.** Docket Entry No. 163.

26   **13.** Docket Entry No. 170.

27   **14.** Docket Entry No. 196.

28                                      8

1    Notice of the IRS Acceptance of the Plan" on August 24, 2009.[15]

2         49. On October 23, 2009, the Debtor filed a "Motion for Approval of Stipulation

3    Resolving Certain Disputes with the Oklahoma Tax Commission" ("OTC Stipulation").[16]

4         50. On November 6, 2009, the IRS filed a "Revised Stipulation Regarding

5    Treatment of IRS Tax Claims" (the "Revised IRS Stipulation").[17] However, this Stipulation was

6    filed with the Court after the conclusion of the presentation of evidence at the contested

7    confirmation hearing.

8                III.  ADDITIONAL FACTUAL FINDINGS

9         The Debtor has been in the restaurant business for a "lifetime," and although

10   certain restaurants in Oklahoma, in which he held ownership interests, have been closed, the

11   Debtor continues to be employed by, or have ownership interests in, various entities which are in

12   the restaurant field.[18]

13         The Debtor expressed his opinion, as an owner or an individual with an

14   ownership interest, as to the value of certain entities listed on his Schedules filed with the

15   Bankruptcy Court.  FL Receivables presented no controverting evidence on the valuation issues,

16   relying instead on whether the Debtor was a credible witness.

17         As to DRD Northwest LLC, the Debtor testified that he held a 33 percent

18   ownership interest therein.[19]  Initially the Debtor called Doug Koch to testify as to the value of

19   an ownership interest in DRD Northwest.  Mr. Koch is a one-third owner in the entity, along

20

21      **15.** Docket Entry No. 201.

22      **16.** Docket Entry No. 222.

23      **17.** Docket Entry No. 232.

24      **18.** For instance, DRD Northwest operates eight restaurants in the Portland, Oregon area.
25   The Debtor still retains a 33 percent interest in this entity.  The Debtor is still employed by QK,
   Inc., which provides, <u>inter alia,</u> "administrative services" to DRD Northwest.

26
     **19.** October 26, 2009 Trial Transcript at 101; also see Uncontested Factual Finding No.
27   22, above.

28                       9

with the Debtor and another individual.  Mr. Koch testified that DRD Northwest owned

approximately eight restaurants in the Portland, Oregon area, but was not familiar with the

current cash flow of the restaurants.  He also was unfamiliar with how to value a minority

interest in a restaurant.  He conceded that the cash flow is the first thing he reviews in attempting

to value a restaurant,[20] but stated that he had not done so recently as to the restaurants operated

through DRD Northwest.[21]  The Court concludes that Mr. Koch provided the Court with no

evidence to assist in the valuation of DRD Northwest.

       The Debtor also presented valuation evidence as to DRD Northwest.  Although he

did not consider himself an expert in business valuation, he had been in the Denny's franchise

business for a "lifetime," and felt comfortable in valuing similar assets held by, and the

operations of, DRD Northwest.[22]  He testified, at trial, that he placed the value of $150,000 on

his Schedules for DRD Northwest, because that was the amount that was listed on his K-1, as an

investment distribution.[23]  On cross examination, the Debtor conceded that if one were to

consider the debts owed by DRD Northwest to its affiliates, the debts of DRD Northwest would

exceed the value of its assets.[24]  Although the Debtor attempted to vitiate such an admission by

noting that he still received a distribution from DRD Northwest, the Court concludes that DRD

Northwest owes a substantial "administrative expense" to its affiliate, QK, Inc., which causes

DRD Northwest to be insolvent on a balance-sheet basis.  Moreover, the Debtor also conceded at

his prior deposition, when presumably the facts of a case are remembered more clearly, that he

simply "took that number [to wit, $150,000] basically off a K-1.  And I know that's . . .not the

---

**20.** October 26, 2009 Trial Transcript at 30.

**21.** October 26, 2009 Trial Transcript at 32.

**22.** October 26, 2009 Trial Transcript at 101.

**23.** Id. at 102.

**24.** Id. at 104-105.

same as real value. But I just knew we had to put something down there [on the Schedules], because it's not valueless. Even though it may be because debts exceed the value of the company."[25] The Debtor presented no other evidence, such as a profit and loss statement, a statement of accounts or accounts receivable and aging thereof, an accounts payable ledger, or cash flow projections, for the Court to determine the value of DRD Northwest. Therefore, the Court concludes that DRD Northwest has a nominal value of $1.

The Debtor received numerous advances from QK, Inc., his employer, over a period of time. On April 1, 2003, the Debtor agreed to repay these advances, on demand, and executed a promissory note ("Note") as evidence thereof.[26] The Debtor provided security for the repayment of the Note.[27] A financing statement was filed to perfect QK, Inc.'s security interest in certain shares of the Debtor's stock and other ownership interests in QK New Mexico, Inc; DRD Property Investments LLC; and DRD Northwest LLC.[28]

The IRS filed tax liens, in Maricopa and Gila Counties, for the payroll obligations of the Debtor concerning the operations of Alden, Inc. During the course of this Chapter 11 proceeding, the Debtor has entered into various stipulations with the IRS to resolve payment of the secured, priority, and unsecured obligations of the IRS. As noted previously, on May 19, 2009, the Debtor entered into the IRS Claim Stipulation, which provided for the treatment of the IRS claim under the Debtor's Plan. Post-confirmation, the Debtor entered into a Revised IRS

---

**25.** Id. at 205, Lines 18-23.

**26.** Exhibit M.

**27.** On April 1, 2003, the Debtor pledged all of his shares in QK New Mexico, Inc. and DRD Property Investments LLC as security for repayment of the Note. Exhibit N. The Debtor also pledged his interest in DRD Northwest LLC as security for repayment of the Note. Exhibit O.

**28.** Exhibit P. Again, the Court cannot find any credible evidence that DRD Property Investments LLC existed or continues to exist. See Findings of Fact Nos. 20 and 25. The Debtor valued an entity named DRD Properties, New Mexico on his Schedule B.

11

Stipulation, clarifying the treatment of the IRS obligations.[29]  Neither Stipulation provides for the IRS' acceptance of the Debtor's plan of reorganization, as amended. Both Stipulations provide for the Debtor's Withdrawal of his Objection to the IRS proof of claim.

Pursuant to the Debtor's stipulation with the IRS, the IRS has agreed to an allowed pre-petition claim in the amount of $770,181.65.  Of said amount, the IRS has an allowed secured claim in the amount of $359,196.54; an unsecured priority claim in the amount of $406,718.15; and a general unsecured claim in the amount of $4,266.96.[30]  Under the Plan, the Debtor will liquidate his life insurance policy and his 401K to fund the Plan. Of the resulting funds, 84 percent will be utilized to pay the IRS' secured claim. In addition, funds obtained from Reza Ghaanati, in the amount of $62,250, will be applied to the IRS' unsecured priority claim. Moreover, the Yucca Property and Pine House will be liquidated, with a portion of the proceeds being applied to the IRS' secured claim. The stipulation with the IRS also set forth a payment regimen under which the Debtor will make monthly payments of $3,000 for the first 12 months of the Plan which will be applied in the reduction of a number of claims, including the claim of the IRS, with the monthly payments to increase over time.[31]

Pursuant to the stipulation the Debtor has entered into with the OTC, the OTC has agreed to an allowed pre-petition tax claim in the dramatically reduced amount of $40,000, which accrues interest at the rate of 5 percent per annum.[32]  An original proof of claim was filed on July 21, 2008, in the amount of $337,330.18.  Subsequent amendments to the claim have reduced the amount from $214,951.03, on February 26, 2009, to $115,898.45 on October 12,

---

**29.** See Uncontested Facts No. 39 and 50.

**30.** See Docket Entry Nos. 152 ("IRS Claim Stipulation") and 232 ("Revised IRS Stipulation").

**31.** The Debtor committed to making monthly payments of $4,050 for months 13 through 36, and $3,700 for months 36 through 60.

**32.** See Docket Entry No. 222.

12

2009, to the current amount of $40,000.  Under the Plan, the OTC will receive the full payment of its allowed pre-petition claim.

The Debtor presented evidence as to the feasibility of his plan, which FL Receivables did not controvert through other witnesses or exhibits.  The Debtor testified that he received wages from QK Inc., which would assist in the payment of his creditors.[33]  On August 20, 2009, QK, Inc. filed a ballot, for Class 2H,  accepting the Debtor's plan of reorganization.[34]

The Debtor estimated, through the sale or liquidation of property, that he could pay the minimum amount of $2,500 per month and the maximum amount of $4,050 per month to his creditors during the term of his plan.[35]  To make the payments, as required, the Debtor's spouse agreed to devote her social security payments to ensure the Debtor had sufficient cash on hand.

The Debtor also proposed to sell the Yucca property in Scottsdale and the Pine property.  Although the Yucca and Pine properties were held by the Ekstrom Family Limited Partnership, with the Debtor's interest therein having been transferred to a revocable trust,[36] the

---

**33.** Exhibit Q.  In 2008, the Debtor received per annum wages of $173,215.82.

**34.** Exhibit CC.  The ballot was filed just prior to the contested confirmation hearing on August 26, 2009.  The amount of the claim listed on the ballot was $244,217.00.

**35.** Exhibit C.  This Exhibit contains a detailed cash flow statement as to the payments to be made to creditors based upon the available funds of the Debtor.  Also, see specifically the Revised IRS Stipulation, Docket Entry No. 232, which outlines the Debtor's payment schedule, with the Debtor devoting (1) $3,000 per month, for months 1 through 12 of the plan, (2) $4,050 per month for months 13 through 36 of the plan, and (3) $3,700 per month for months 32 through 60 to pay Debtor's counsel, the Arizona Department of Revenue, the IRS, and the OTC, *pro rata,* with the IRS agreeing to defer payment of its claim, if necessary, to ensure that the Arizona Department of Revenue and the OTC are paid in full.

**36.** October 26, 2009 Trial Transcript at 41.  The Debtor testified that he had no will, and his limited partnership interest was transferred to his revocable trust for estate planning purposes.  The Debtor concedes that his revocable trust is an asset of this bankruptcy estate; hence, the liquidation of trust assets to pay his creditors.

13

Debtor estimated that the Pine property had potential equity of $70,000,[37] and the Yucca Property, in Scottsdale, had potential equity of $110,000.[38] The Debtor also intended to sell the Idaho property owned by the E-Z Livin' Inn LLC, which was owned by the Ekstrom Family Limited Partnership, with his interest having been transferred to his revocable trust. He estimated that there was about $40,000 equity in the property owned by the E-Z Livin' Inn.[39]

As noted previously, concerning the issue of feasibility, the Debtor testified that he would liquidate his 401K, normally property which is considered exempt from levy or liquidation by creditors of the bankruptcy estate, to pay approximately $172,000 to his creditors, principally the IRS.[40] The Debtor stated that he would use the cash surrender value of his life insurance policy for plan purposes. Reza Ghanatti testified that he would provide the Debtor with $62,250 for plan confirmation purposes. Based upon the foregoing, the Debtor estimated that $100,000 to $350,000 would be paid to the IRS over time, with any unpaid debt still due and owing to the IRS to be deemed nondischargeable at the end of the plan's term, and the aggregate amount of between $400,000 to $750,000 to be paid to his creditors during the term of his plan.[41] To ensure feasibility, the Debtor stated that he would have the sum of $150,000 available to commence making payments to his creditors upon the effective date of the plan.

---

**37.** October 26, 2009 Trial Transcript at 39-40. The Debtor listed the Pine property with $70,000 in equity on his Schedules. See Exhibit R, Schedule A. He felt the equity had remained the same on this property.

**38.** October 26, 2009 Trial Transcript at 40. The Debtor listed the Yucca Property with a value of $260,000 on his Schedule A, Exhibit R. However, he testified that he believed that the value of the home had declined by $10,000 to $250,000, , also causing his equity therein to decline by the same amount.

**39.** October 26, 2009 Trial Transcript at 39-40. E-Z Livin' Inn owns property in Lava Hot Springs, Idaho, which consists of rental units. Initially there was about $42,000 in equity in the property, but he thinks that equity may have declined by $5,000 to $10,000.

**40.** Exhibit C. The actual distribution may be somewhat less depending on whether the Debtor requests that taxes for such a distribution be withheld.

**41.** Exhibit C; also see Revised IRS Stipulation, Docket Entry No. 232.

14

The Court concludes that the Debtor has made a good faith effort to propose and confirm his plan of reorganization by (1) devoting all of his exempt and non-exempt assets to the payment of his creditors, (2) having his wife pledge her social security payments to the success of his plan, and (3) obtaining financing from a third party. Although the Debtor is unclear as to how much of a distribution his creditors will receive, the Court concludes that the value of the property to be distributed under the plan is not less than the projected disposable income of the Debtor during the period for which the plan provides payments.

Concerning the claim of Ireland Bank, the Debtor borrowed the sum of $39,560.03 from the Bank on July 20, 2007, which obligation was secured by a deed of trust on the Idaho property owned by EZ Livin' Inn.[42] In turn, EZ Livin' Inn separately hypothecated the Idaho property as security for the repayment of the Debtor's obligations to the Bank.[43] EZ Livin' Inn is an Idaho limited liability company. There is no evidence to reflect that the assets and liabilities of this separate entity have become the assets and liabilities of the Debtor, through substantive consolidation or some type of piercing of the "corporate" veil.

The Court initiated the contested confirmation hearing on May 26, 2009. However, the Court advised Debtor's counsel that it was unable to confirm the Debtor's Plan at that time because the claim of the OTC had not been resolved, and the Court concluded that the Debtor's Plan could not be deemed feasible until that sizeable claim had been quantified. At the request of the Debtor, the Court continued the contested confirmation hearing to October 26, 2009. The Court conducted an evidentiary hearing concerning confirmation of the Debtor's Plan on October 26, 2009. At the beginning of the hearing, counsel for the IRS stated that it "supported the plan." [44]

IV. ISSUES PRESENTED

---

**42.** Exhibit 21.

**43.** Exhibit 22.

**44.** October 26, 2009 Trial Transcript at 7, Lines 20-21.

15

1. Whether the Plan has been proposed in good faith as required by Bankruptcy Code § 1129(a)(3).

2. Whether the Debtor has unfairly discriminated against FL Receivables under § 1129(b).

3. Whether Ireland Bank is a creditor of the Debtor and able to vote for the Plan.

4. Whether the Plan has been accepted by at least one impaired class as required by Bankruptcy Code § 1129(a)(10).

5. Whether the Plan is feasible pursuant to § 1129(a)(11).

## V. DISCUSSION

1. <u>Whether the Plan has been proposed in good faith as required by Bankruptcy Code § 1129(a)(3).</u>

A Chapter 11 debtor has the burden of proving that its proposed plan satisfies statutory confirmation requirements. 11 U.S.C. § 1129(a); <u>In re Arnold and Baker Farms</u>, 177 B.R. 648 (9th Cir. BAP 1994); <u>In re Marshall</u>, 298 B.R. 670 (Bankr.C.D.Cal. 2003). A chapter 11 plan is proposed in good faith when it achieves a result consistent with the objectives and purposes of the Bankruptcy Code. <u>In re Sylmar Plaza, L.P.</u>, 314 F.3d 1070, 1074 (9th Cir. 2002); <u>In re Arnold and Baker Farms</u>, 177 B.R. 648 (9th Cir. BAP 1994). In determining whether a debtor has acted in good faith in proposing a reorganization plan, the court must take into account the totality of the debtor's circumstances. <u>In re Jorgensen</u>, 66 B.R. 104, 108-09 (9th Cir. BAP 1986).

The Debtor has met the good faith requirement under section 1129(a)(3). The testimony and facts reflect that the Debtor sought bankruptcy protection, in part, because of his inability to pay a judgment in excess of $4 million obtained by FL Receivables in 2005. However, the Debtor also incurred sizeable obligations due and owing to the IRS and the OTC, which necessitated his seeking some type of bankruptcy protection. In 2008, the IRS filed a proof of claim in the aggregate amount of $802,613.02, and the OTC filed a proof of claim in the

16

1  aggregate amount of $337,330.18.  During the course of these reorganization proceedings, the

2  Debtor was able to enter into a viable resolution of the IRS and OTC claims.

3         The Court must also consider that the Debtor is an individual, and the

4  requirements for confirmation of a plan are different as a result of the changes brought about by

5  the amendments to the Bankruptcy Code.[45]  In this matter, the Debtor is devoting all of his

6  exempt and non-exempt property to the payment of his creditors.  His wife has agreed, as well,

7  to devote her social security payments to the funding necessary for the plan.  Finally, the Debtor

8  has obtained funding from a third party, Mr. Ghanatti, to assist him.

9         In reviewing the requirements pertaining to an individual, if an unsecured creditor

10  objects to confirmation, a debtor may confirm a plan over that creditor's objection if the debtor

11  complies with 11 U.S.C. §1129(a)(15).  Presumably if a debtor meets the requirements of

12  Section 1129(a)(15), the debtor has met the statutory confirmation requirements that are

13  consistent with the objectives and purposes of the Bankruptcy Code, and the Court should

14  overrule the good faith objection.   In turn, Section 1129(a)(15) relies on Section 1325(b)(2) to

15  determine if the debtor has, indeed, devoted all of his disposable income to the payment of his

16  creditors.[46]  After a review of the evidence, the Court concludes that the Debtor has met the

17

18  **45.**  This case was filed after October 17, 2005.  Therefore, BAPCPA is applicable.

19  **46.**  11 U.S.C. §1325(b)(2) (West 2009) provides as follows:

20
21  For purposes of this subsection, the term "disposable income" means current monthly income
received by the debtor (other than child support payments, foster care payments, or disability
22  payments for a dependent child made in accordance with applicable nonbankruptcy law to the
extent reasonably necessary to be expended for such child) less amounts reasonably necessary to
23  be expended--

24     (A)(i) for the maintenance or support of the debtor or a dependent of the debtor, or for a
25     domestic support obligation, that first becomes payable after the date the petition is filed;
       and
26

27        (ii) for charitable contributions (that meet the definition of "charitable

28                                          17

1     requirements of Sections 1129(a)(15) and 1325(b)2).

2         The Debtor has outlined the amounts that are reasonably necessary for the

3 maintenance or support of himself and his wife, and has agreed to devote any surplus to the

4 payment of his creditors. He has also agreed to liquidate his exempt and non-exempt property to

5 increase the distribution to his creditors. In this case, FL Receivables, the only objecting

6 creditor, is a general unsecured creditor of the Debtor. In reviewing the evidence presented, the

7 Court concludes that the value of the property to be distributed by the Debtor under his plan is

8 all of his projected disposable income that he will receive during the course of his 60-month plan

9 Although FL Receivables attempts to portray the Debtor as being vindictive as to it, with the

10 Debtor filing his bankruptcy petition after FL Receivables obtained a judgment against the

11 Debtor in excess of $4 million, the Court concludes that the Debtor has filed his petition in good

12 faith because of the sizeable tax obligations that he needs to resolve. The Debtor has proposed a

13 plan which essentially proposes to distribute or liquidate everything that he owns of any value to

14 pay his creditors. As noted, the Debtor has devoted all of his disposable income to the payment

15 of his creditors over 60 months.

16         The Court concludes that the Debtor has worked to achieve the objectives which

17 are consistent with the Bankruptcy Code. The Debtor negotiated with all of his creditors, and

18 presented a plan with the near-unanimous consent of his creditors.[47] The good faith evaluation

19 must be made on a case by case basis. In re Marshall, 298 B.R. 670 (Bankr.C.D.Cal. 2003). The

20

21         contribution" under section 548(d)(3) to a qualified religious or charitable entity
         or organization (as defined in section 548(d)(4)) in an amount not to exceed 15

22         percent of gross income of the debtor for the year in which the contributions are
         made; and

23

24         (B) if the debtor is engaged in business, for the payment of expenditures necessary for the
         continuation, preservation, and operation of such business.

25

26       **47.** The general unsecured creditor class, along with FL Receivables, have rejected the
Debtor's plan of reorganization. However, such a result is natural, given that the Debtor

27 proposes to pay general unsecured creditors nothing under his plan.

28

1  Court sees no basis, in law or fact, to conclude that the Debtor is not acting in good faith.  The

2  Court concludes that the Debtor has proposed his plan in good faith and not by any means

3  forbidden by law.  Therefore, the Court finds that the provisions of Section 1129(a)(3) have been

4  met, and the Objection of FL Receivables on this point is overruled.

5

6             2.  <u>Whether the Debtor unfairly discriminates against FL Receivables</u>

           <u>in contravention of the requirements under Bankruptcy Code § 1129(b)(1).</u>

7

8          FL Receivables assets, as a separate issue, that the Debtor's Plan unfairly

9  discriminates against FL Receivables' Claim and that confirmation should be denied under

10  Section 1129(b)(1).  The Court disagrees.  First, as reflected hereinafter, the Court intends to

11  disallow the votes of Ireland Bank, as a creditor with a secured claim against the Debtor, and has

12  placed the Bank in the same class with FL Receivables.  As such, although Ireland Bank may be

13  paid from its collateral, including the rents obtained from the Idaho property, Ireland Bank must

14  be paid as any other general unsecured creditor of this estate.  Second, the Court has set forth

15  below its determination that QK, Inc. has an allowed secured claim as to this Debtor.  The Court

16  is unable to place a precise value on the value of QK,Inc.'s collateral.  However, the Court has

17  reviewed the underlying documentation concerning the claim and concludes that QK, Inc.

18  obtained a perfected security interest on several entities in which the Debtor has an interest.

19  Under 11 U.S.C. §1122(a), a debtor may place a claim or an interest in a particular class only if

20  the claim "is substantially similar to the other claims. . .of such class."  Because QK, Inc has an

21  allowed secured claim, and FL Receivables has a general unsecured claim, the Court concludes

22  that the Debtor was correct in placing them in separate classes.  <u>In re EBP, Inc.</u>, 172 B.R. 241

23  (Bankr.N.D.Ohio 1994).  Once placed in separate classes, the Debtor may treat the claims

24  differently.  It is not unfair discrimination, under Section 1129(b), to discriminate, or treat

25  differently, a creditor with a secured claim from a creditor which has a general unsecured claim.

26  In fact, the statute requires it. The Court concludes, based upon the facts of this case, that the

27  Debtor has not unfairly discriminated in its treatment of the FL Receivables claim vis a vis the

28                                      19

1    claim of QK, Inc.  The objection of FL Receivables on this point is overruled.

2

3                3. <u>Whether Ireland Bank is a creditor of the Debtor and able to vote for the Plan</u>.

4           FL Receivables argues that the Court should disregard the vote cast by Ireland

5    Bank in favor of the Plan.  The Debtor has placed Ireland Bank in Classes 2.E and 2.F.  Class

6    2.E. consists of the claim of Ireland Bank for the first mortgage on the Idaho Property.  Class

7    2.F. consists of the claim of Ireland Bank for the second mortgage on Idaho Property.  FL

8    Receivables asserts that Ireland Bank is not a secured creditor of this Debtor; therefore, the Bank

9    may not have a secured claim or any deficiency claim resulting from the value of the collateral

10   being less than the debt owing.  While Ireland Bank's obligations are secured by two deeds of

11   trust against the Idaho property,[48] it is EZ Livin' Inn LLC, a non-debtor,  that is the owner of the

12   Idaho property.  EZ Livin' Inn LLC has pledged or hypothecated its property in support of the

13   Debtor's obligations to Ireland Bank.  Since the property securing Ireland Bank's debt is not

14   property of the bankruptcy estate, Ireland Bank does not have a secured claim, or any type of

15   deficiency claim, for purposes of the Debtor's plan.[49]   As such, FL Receivables argues that

16   Ireland Bank has improperly cast two ballots in favor of the Debtor's plan.

17          The Debtor argues that Ireland Bank is a secured creditor of the estate.  The basis

18   of his argument is that even though  EZ Livin' Inn, LLC holds legal title to the property, since he

19   personally borrowed the funds from Ireland Bank,  made all payments on the debt, and holds a

20   100 percent interest in EZ Livin' Inn LLC, the Debtor's "equitable interest" is sufficient to

21   render Ireland Bank a secured creditor for purposes of the Plan. The Court disagrees.

22          It is undisputed that title to the property is vested in EZ Livin' Inn, LLC. The

23   membership interests in EZ Livin' Inn, LLC are held by the Debtor, his wife and Standard

24   ──────────────

25          **48.** As of the Petition Date, the sum of $97,464.47 was due and owing on the first deed

26   of trust, and the sum of $38,318.97 was due and owing on the second deed of trust.

27          **49.** *See* 11 U.S.C. §506(a).

28                                                      20

Management, LLC. [50] The EZ Livin' Inn, LLC is owned by the Ekstrom Family Limited Partnership.[51] The Debtor holds a 49.5 percent limited partnership interest in the partnership.[52] The Debtor's wife also holds a 49.5 percent limited partnership interest. A 1 percent general partnership interest in the Ekstrom Family Limited Partnership is held by Standard Management LLC.[53] The Debtor's interest in the Ekstrom Family Limited Partnership was contributed to the Dennis Ekstrom Living Trust. The Debtor is essentially requesting that the Court disregard several legal entities to determine that Ireland Bank is a secured creditor of the Debtor.

There is little precedent on the issue. However, the recent case of In re Hecker, 414 B.R 499 (Bankr. D. Minn. 2009) is instructive on the utilization of corporate veil piercing done for the purpose of allowing a debtor to claim personal ownership in certain property titled in the name of a corporate entity. In Hecker, utilizing the doctrine of "reverse piercing of the corporate veil," the debtor sought a homestead exemption, under Minnesota law, in certain real property owned by a limited liability company that was wholly owned by a second limited liability company, of which the debtor held a majority interest. Id. at 502.[54] The debtor in Hecker requested that the court disregard corporate formalities. The Court found that the debtor failed to met the two-prong test applied in traditional veil piercing cases in Minnesota. Moreover, the Court pointed out that the debtor, as an experienced businessman, had enjoyed the benefits of limited liability protection for many years, and had the means to purchase a

---

**50.** See Docket Entry No. 219; Amended Pre-Trial Statement, p. 3, Line 12.

**51.** See Id.

**52.** See Docket Entry No. 219; Amended Pre-Trial Statement, p. 3, Line 9.

**53.** See Docket Entry No. 219; Amended Pre-Trial Statement, p. 3, Line 10.

**54.** The Court described the debtor's actions as "reverse piercing of the corporate veil." Normally a creditor seeks to pierce the corporate veil to bring in the assets and liabilities of the corporation as if they were the assets and liabilities of the individual debtor. Presumably the Court referred to the concept as "reverse piercing of the corporate veil," because the debtor who created the corporate entity was the party requesting that the entity be disregarded.

21

1  homestead in his own name, but chose not to so proceed. Therefore, in addition to not meeting

2  the test for veil piercing, the Court concluded that the equities of the case also did not support

3  the reverse piercing requested by the debtor. Id. at 507. The Court concluded that allowing the

4  debtor to disregard the corporate formalities he created would have been an abuse of the remedy.

5  Here, we also have an experienced businessman who created numerous limited

6  liability companies. The Debtor has created such entities for estate planning purposes, but the

7  Debtor's requested relief is similar to veil piercing; that is, the Debtor wishes to shield certain

8  assets from the reach of creditors. The Debtor has enjoyed the benefits of limited liability, and

9  must now accept the consequences of such estate planning. Moreover, the Debtor never filed a

10 Motion for Substantive Consolidation. Had he done so, all of the assets and liabilities of the

11 non-debtor entities, such as EZ Livin' Inn LLC, could have potentially been merged into one

12 bankruptcy estate for fair and equitable distribution of the Debtor's collective assets in payment

13 of all of his obligations. On this record, however, the Court sees no basis to create the remedy of

14 substantive consolidation or veil piercing without appropriate notice, hearing, and a

15 consideration of the matter on the merits.

16 The Debtor does cite the Court to In re Farnsworth, 384 B.R. 842 (Bankr. D. Ariz.

17 2008) for the proposition that Ireland Bank has an equitable lien on the property chargeable

18 against the Debtor. In Farnsworth, the Chapter 13 debtor claimed a homestead exemption in real

19 property that she had purchased pre-petition, in her name only, using $10,000 of a her ex-

20 fiancee's money and $3,000 of her own money as the down payment. After the parties ended

21 their relationship, the ex-fiancee was locked out, he initiated a lawsuit in the Superior Court, and

22 he recorded a notice of lis pendens on the real property. The Superior Court granted him an

23 equitable lien for $10,000 and the right to foreclose the lien. Before the order was reduced to

24 final judgment, the debtor filed her bankruptcy case. However, the Farnsworth decision is

25 inapposite. First, the State Court had already concluded the nature of the ex-fiancee's interest in

26 the real property prior to the debtor filing her bankruptcy petition. It was only the ministerial act

27

28                                                22

of the entry of the judgment that had not been effectuated.  It was appropriate for the Bankruptcy Court to give effect to the State Court's ruling on the merits.  This Court is not presented with a similar ruling from a state court  Second, the facts in <u>Farnsworth</u> reflect that the ex-fiancee provided the debtor with his funds for the specific purpose of acquiring an interest in real property.  When the debtor did not provide him with the agreed-upon interest or repay his funds, the Court fashioned a remedy to provide, in equity, what the ex-fiancee should have received. In this case, the Debtor borrowed funds from Ireland Bank, and Ireland Bank received the bargained-for security to repay the Debtor's obligation by having a third party, EZ Livin' Inn LLC, separately hypothecate its property as collateral for the Debtor's obligations.  There is no remedy that this Court need fashion, in equity, to provide relief to Ireland Bank.  Ireland Bank has a valid lien on the Idaho property; however, the Idaho property is not property of this bankruptcy estate.

Section 506(a) provides, in pertinent part, that a creditor has "a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property. .  and is an unsecured claim to the extent that the value of such creditor's interest . . .is less than the amount of such allowed claim."  11 U.S.C. §506(a)(West 2009).  The purpose of this Section is to determine to what extent a creditor is secured, and if the creditor will not be paid in full from its collateral, to what extent it has an unsecured or deficiency claim.  However, the first step in the analysis must be that the debtor has an interest in the property to which the creditor's claim attaches.  If the debtor has no legal or equitable interest in the property, the creditor must be considered unsecured, vis-a-vis the debtor.  Of course, if the creditor is able to liquidate its collateral, apart from the bankruptcy proceedings, that may affect the amount of the unsecured claim that the creditor pursues in the bankruptcy proceedings.[55]  However, the nature of the claim as an unsecured claim of the debtor does not change.

---

**55.**  In some cases, when a non-debtor third party has pledged its assets in support of a debtor's obligations, the debtor or a creditor of the debtor may request that the creditor with collateral  "marshal its assets" to pay down the creditor's claim.

23

1    The Court concludes that Ireland Bank is a general unsecured creditor of the

2    Debtor, but it has been improperly classified, in the Debtor's Plan, as a secured creditor.  As

3    such, the ballots of Ireland Bank, as an impaired secured creditor, in two separate classes, must

4    be rejected. Because the Debtor does not own the Idaho property, the property cannot give rise to

5    a secured claim for Ireland Bank. Ireland Bank is an unsecured creditor of the Debtor, because

6    the facts reflect that the Debtor has executed a promissory note to repay an obligation that he

7    owes to the Bank.  Accordingly, Ireland Bank is an unsecured creditor of the Debtor, and cannot

8    be separately classified from other unsecured claims for voting purposes. Because FL

9    Receivables has the largest claim, by dollar amount, in the general unsecured creditor class, the

10   placement of Ireland Bank into said class does not change the rejection of the general unsecured

11   creditor class of the Debtor's Plan.  Ireland Bank's votes in Classes 2.E. and 2.F will not count in

12   determining whether the Debtor's Plan has been accepted by an impaired class.  The Objection

13   of FL Receivables, as to this issue, is sustained.


15   <u>4. Whether the Plan has been accepted by at least one impaired class as required</u>
     <u>by Bankruptcy Code § 1129(a)(10).</u>

16       The Debtor has identified three classes he believes are impaired under the Plan:

17   Ireland Bank's secured claims (Classes 2.E and 2.F), the IRS secured claim (Class 2.J) and QK

18   Inc.'s secured claim (Class 2.H).  Although Ireland Bank is the only class of the three to have

19   submitted a timely ballot, the Debtor argues that all three accepted the Plan. The Court has

20   already determined that Ireland Bank's claims are not secured claims for purposes of this Plan.

21   With respect to the two remaining classes, the IRS never submitted a formal ballot on the Plan

22   and QK, Inc. did submit a ballot, albeit, three months late on August 24, 2009.[56]  The Court has

23   set forth below its analysis as to whether the IRS or QK, Inc. is an impaired consenting class.

24       A. The IRS Claim

26   _____

27   **56.** See Docket Entry No. 201.

28                                    24

1       FL Receivables argues that the IRS claim in Class 2.J is not an accepting secured

2  claim. The IRS filed a proof of claim on July 16, 2008.  The Debtor objected to the IRS proof of

3  claim on January 26, 2009. 11 U.S.C. §§ 501 and 502 (West 2009).  FL Receivables argues that

4  the Debtor's Objection was never withdrawn nor ruled upon prior to the contested confirmation

5  hearing,[57] and that the Court never temporarily allowed the IRS claim for voting purposes.

6  Based on the foregoing, FL Receivables contends that the IRS does not have an allowed claim,

7  and is not eligible to vote to accept the Plan. 11 U.S.C. § 1126; Bankr. R. 3018(a).

8       Section 1126(a) provides that a holder of a claim allowed under Section 502 may

9  accept or reject a plan.  Section 502(a) indicates that a claim is deemed allowed unless a debtor

10  objects. A creditor which has a claim to which an objection has been interposed, therefore, is not

11  allowed to vote on the plan unless the objection is adjudicated prior to plan voting or a

12  mechanism, such as temporary allowance, has been provided to the claimant.  In re Stone Hedge

13  Properties, 191 B.R. 59 (Bankr. M.D. Pa. 1995).  Until a party is deemed to have an allowed

14  claim, or actually has an allowed claim, it has no right to accept or reject a Chapter 11 plan. In re

15  M. Long Arabians, 103 B.R. 211 (9th BAP 1989). Whether to temporarily allow a claim, for

16  voting purposes on proposed Chapter 11 plan, is left to the bankruptcy court's discretion. In re

17  Armstrong, 294 B.R. 344 (10th Cir. 2003).  In this case, in the May 2009 Stipulation, the Debtor

18  withdrew his objection to the IRS proof of claim.  The withdrawal of the Objection to the IRS

19  proof of claim by the Debtor was prior to the Debtor's filing an Amended Plan and prior to the

20  contested hearing on confirmation.  Thus, the Court concludes that at the time of the October

21  2009 contested hearing on confirmation, there was no pending Objection on the IRS proof of

22

23

24      **57.** A hearing was scheduled on the Objection to the IRS proof of claim for March 24, 2009. However, the hearing was vacated at the request of counsel, at a hearing held on March 10, 2009 due to the Objection not being properly served on the Department of Justice. The IRS Claim Stipulation was filed on May 19, 2009.  The Amended Plan was filed on June 8, 2009. A Motion to Accept Late Filed Ballots of QK, Inc. and Take Notice of IRS Acceptance of the Plan was filed on August 24, 2009. On November 6, 2009, after the close of evidence, the Debtor filed a Revised IRS Stipulation.

25

26

27

28

1 claim, and the IRS could have voted on the Debtor's Plan.

2 However, even assuming that the IRS could vote on the Debtor's Plan, FL

3 Receivables presents a second cogent argument. The IRS also failed to submit a ballot by the

4 May 5, 2009 deadline or at any other time prior to the contested confirmation hearing.

5 Bankruptcy Rule 3017(c) states that on or before approval of the disclosure statement, the clerk

6 of the court must fix the time for objecting to or accepting the plan of reorganization and fix the

7 date for the confirmation hearing. These dates will be noticed out to creditors and interested

8 parties when the debtor or the plan proponent files the plan and the disclosure statement. Once

9 the date for filing an acceptance or rejection of the plan has been fixed, a creditor must accept or

10 reject the plan within this time limit, or move the court to permit late filing where failure to file

11 timely was the result of excusable neglect. In re Paul, 101 B.R. 228 (Bankr. S.D. Cal. 1989).

12 In this case, the deadline to submit a ballot was May 5, 2009. Rather than

13 acknowledge that the IRS did not submit a timely ballot, the Debtor argues that the IRS Claim

14 Stipulation, filed on May 19, 2009, serves as the "ballot" for purposes of accepting the Plan.

15 First, the IRS Claim Stipulation was filed after the deadline of May 5. Second, there is nothing

16 in the Stipulation which would qualify as the requisite acceptance or rejection of a plan.

17 According to the mandates of Bankruptcy Rule 3018(c), the acceptance or rejection of a plan of

18 reorganization must: 1) be in writing; 2) be signed by the creditor, equity security holder or agent

19 filing same; 3) identify the plan to be accepted or rejected; and 4) conform to the appropriate

20 Official Form. According to the Debtor, the IRS Claim Stipulation is a writing, signed by the

21 IRS' counsel, indicates the class treatment, the amount of the claim, and the IRS' acceptance of

22 the Plan; nothing more is required. The Court disagrees. The appropriate official form, Official

23 Form 14[58], is used as a ballot for accepting or rejecting a plan of reorganization. The instructions

24 on the ballot explicitly state that "A PERSON ENTITLED TO VOTE ON THE PLAN MUST

25 COMPLETE AND RETURN THE BALLOT IN ORDER TO HAVE THE VOTE COUNT."

26

27 **58.** Official Form 14: (Revised 12/03).

28 26

The instructions to the ballot provide the following specific directions:

> Only the applicable language from the alternatives shown on the Official Form should be included in the ballot, but the ballot may be modified to the particular requirements of the case. See Fed. R. Bankr. P. 9009. The form is designed to be customized by the proponent so that each class of creditor, debt security holder, or equity security holder under the plan will receive a ballot that only applies to that class. Official Form 14, Section III, Line 1.

The directions set forth what must be provided in the ballot to "conform" to the Official form.[59] For example, Line 8 of Section III of the instructions states that the "proponent should indicate on the second line [of the ballot] whether the disclosure statement was approved or conditionally approved by the court." The IRS Claim Stipulation does not contain this language. The person or entity voting on the plan should explicitly state, by checking a box, whether it "Accepts the Plan" or "Rejects the Plan." A review of the IRS Claim Stipulation does not contain any information as to whether the IRS accepts or rejects the Plan. These variances are significant enough that the Court is unable to conclude that the Stipulation "conforms" to the appropriate Official Form pursuant to Bankruptcy Rule 3018(c). The process by which creditors vote on a plan of confirmation is governed by rules designed to insure the integrity and manageability of the voting process. Bakes v. Official Committee of Unsecured Creditors, 359 B.R. 831 (S.D. Fla. 2007).

Here, the IRS Claim Stipulation was filed on May 19, 2009. Pursuant to the Order approving the disclosure statement, May 5, 2009 was set as the deadline by which to accept or reject the April 1 plan. As such, the IRS Claim Stipulation was filed two weeks after the deadline, and even then a ballot was not submitted. An Amended Plan was filed on June 8, 2009. Then on August 24, 2009, the Debtor filed a Motion to Accept Late Filed Ballots of QK, Inc. and Take Notice of IRS Acceptance of the Plan, but no ballot was submitted by the IRS. At the contested confirmation hearing on October 26, 2009, counsel for the IRS stated that it was in

---

**59.** See Official Form, Section III, Lines 6-18.

1  support of the Debtor's Plan, but did not request that a late filed ballot be considered by the

2  Court.  On November 6, 2009, after the close of evidence at the contested confirmation hearing,

3  the Debtor filed a Revised IRS Stipulation, which also did not contain or incorporate a late filed

4  ballot.

5          The Debtor and the IRS negotiated over a prolonged period of time to

6  memorialize the treatment of the IRS claim, yet failed, time after time, to submit a ballot as

7  required by Bankruptcy Rule 3018( c).  The Court concludes, based upon the facts of this case,

8  that the IRS never provided a ballot to accept or reject the Debtor's Plan and may not be counted

9  as an impaired consenting class to the Debtor's Plan.  The FL Receivables' Objection on this

10  point is sustained.

11

12          B. The QK, Inc. Claim

13          The last remaining impaired claim which may be considered to determine whether

14  the Debtor has an impaired consenting class is the QK, Inc. claim, in Class 2.H.  QK, Inc. filed

15  its ballot on August 24, 2009, after the deadline of May 5, 2009.  FL Receivables argues that

16  QK, Inc. is not an accepting secured claim.  The parties have stipulated that QK, Inc.'s claim is

17  secured by a security interest in the Debtor's ownership stake in three entities:  (a) a 10 percent

18  interest in QK New Mex, Inc., (b) a 10 percent interest in DRD Property Investments LLC and

19  (c) a one-third interest in DRD Northwest, LLC.  There is no other collateral for this claim.  As

20  noted previously in the factual discussion, the Court is unable to determine the existence of DRD

21  Property Investments, LLC.[60]

22          The gist of FL Receivables' argument is that in order to be a secured creditor,

23  QK, Inc. must have a lien against estate property that has some value, and in this case, the

24  Debtor's interest in the three entities has no value.  11 U.S.C. § 506(a)(West 2009).  The parties

25

26          **60.** *See* Findings of Fact Nos. 20 and 25.  The Debtor only listed DRD Properties, New

27  Mexico, on his Schedule B, with a value of $8,000.

28                                          28

have stipulated that the Debtor's ownership interest in QK New Mex, Inc. has no value. The Debtor valued his interest in DRD Properties, New Mexico, at $8,000 on his Schedule B, but this interest does not serve as collateral for the QK, Inc. obligation. As to DRD Property Investments LLC, there is no credible evidence in the record as to its value. Therefore, the Court must value that interest as zero for purposes of this decision.

Thus, the only interest that remains is the Debtor's interest in DRD Northwest, LLC. The Debtor valued his one-third interest in DRD Northwest, LLC at $150,000 on his Schedules. At trial, the Debtor was able to present little credible evidence as to the value of this interest. As argued by FL Receivables, DRD Northwest, LLC is a closely-held company, and the Debtor holds only a minority interest in the Company. There is no recognizable market for this minority interest. The Company's balance-sheet reflects that it is insolvent. The Debtor's interest has a de minimus value of $10,000. However, QK, Inc. does have collateral as security for the repayment of its indebtedness. Moreover, there is no prohibition for a creditor to assert a secured claim and be paid as a secured creditor even though its collateral has little or no value. 11 U.S.C. §506(West 2009). The payment of QK, Inc. may need to be altered, pursuant to the Plan, but the Debtor may still consider the claim as secured for purposes of voting on his Plan.

Unlike the IRS, QK, Inc. did file a ballot, albeit over three months late on August 24, 2009. QK, Inc., also unlike the IRS, did file a Motion with the Court to allow the late filed ballot. In its Motion, QK, Inc. states that it did not have bankruptcy counsel through the initial stages of the bankruptcy process, and did not retain counsel until the principals were noticed for their depositions in August 2009.[61] QK, Inc. provides no other justification for its late filed ballot. The Court also notes that the Debtor did file an amendment to his Plan, and the hearing on confirmation was continued, as a contested confirmation hearing, to October 2009. It is difficult, on this record, to find any prejudice to any creditor as a result of QK, Inc.'s actions.

---

**61.** See Docket Entry No. 201.

1    Some courts have held that a late ballot cannot be counted unless the Court, on

2  Motion and after finding excusable neglect, extends the time for voting. See, e.g., Hanson v.

3  First Bank of South Dakota, N.A., 828 F.2d 1310, 1314 (8th Cir.1987); In re Global Ocean

4  Carriers Ltd., 251 B.R. 31 (Bankr. D. Del. 2000). Other courts, however, have been more liberal

5  in allowing late ballots. See, e.g., In re Rhead, 179 B.R. 169, 177 (Bankr.D.Ariz.1995); In re

6  Paul, 101 B.R. 228 (Bankr. S.D. Cal. 1989).

7    Pursuant to Rule 9006(b), "the court for cause shown may at any time in its

8  discretion . . . order the period enlarged if the request therefor is made before the expiration of

9  the period originally prescribed."  As the Rule itself makes explicit, enlargement of time rests

10  within the Court's discretion.  Jenkins v. Commonwealth Land Title Ins. Co., 95 F.3d 791 (9th

11  Cir. 1996).  Bankruptcy Rule 9006 provides that the deadline for accepting or rejecting a plan

12  may be extended "for cause shown" if a "request" is made "before the expiration of the period

13  originally prescribed."  Bankr. R. 9006(b); Pioneer Inv. Services Co. v. Brunswick Associates

14  Ltd. Partnership, 507 U.S. 380, 113 S.Ct. 1489 (1993).  In reviewing a claim of excusable

15  neglect, courts should consider "(1) the danger of prejudice to the non-moving party, (2) the

16  length of delay and its potential impact on judicial proceedings, (3) the reason for the delay,

17  including whether it was within the reasonable control of the movant, and (4) whether the

18  moving party's conduct was in good faith."  Los Altos El Granada Investors v. City of Capitola,

19  583 F.3d 674, 683 (9th Cir. 2009).

20    In the case of In re Rhead, 179 B.R. 169 (Bankr. D.Ariz. 1995), the Maricopa

21  County Treasurer and debtor agreed on the day the ballots were due (July 5th)  concerning plan

22  modifications to provide certain treatment on the County's tax claim. The agreement was

23  memorialized the following day, on July 6, with the ballot being executed the day after that on

24  July 7. Everything transpired within a quick 3-day period.  In the decision of In re Rhead, the

25  Court held that the existence of the July 4 holiday, which resulted in the casting of the ballot a

26  couple of days late, was sufficient to find "excusable neglect" to justify the extension of the

27

28                                            30

voting deadline. Moreover, the Court held that no specific motion needed to be filed requesting the extension in light of the modified plan and amended ballot report, along with the argument of counsel at a hearing. These were deemed sufficient to qualify as a "motion" as required by Bankruptcy Rule 9006.

In another case, In re Paul, 101 B.R. 228 (Bankr S.D. Cal 1989), the Court held that the creditors' ballots rejecting a proposed Chapter 11 plan, which were filed late but prior to the confirmation hearing, would be counted where the late filing caused neither delay nor prejudice to the debtor and there was no evidence that creditors were acting in bad faith. Id. In the Paul decision, the ballots were due on October 6, 1988. One creditor, the IRS, mailed its ballot to the wrong address, and it was not received at the correct address until October 12. Another creditor hand-delivered their ballot to the debtor on October 11. The debtor acknowledged receipt of both late ballots in its ballot summary. Since there were no other issues, and no delay or prejudice to the debtor as a result of the late ballots, the Court concluded that the creditors had sufficiently established excusable neglect under Bankruptcy Rule 9006. As in the Rhead decision, the issue of the late filed ballots was remedied within a couple of days of the bar date.

In this case, the Debtor set May 5, 2009, as the date certain for creditors to file their ballots accepting or rejecting the Plan. The Debtor continued to negotiate with the IRS and the OTC to resolve the concerns of the taxing authorities to the Debtor's Plan. The Debtor filed an amendment to his Plan on June 8, 2009. An initial contested confirmation hearing needed to be continued to October 26, 2009, because the Debtor was unable to prove feasibility until he had resolved the OTC claim amount. Ultimately the Debtor filed an OTC Stipulation prior to the October 26, 2009 confirmation hearing. Although the ballot of QK,Inc. was filed substantially after the May 5, 2009 date, the principals of the entity did not realize that they had the opportunity to cast a ballot until the noticing of their depositions, which prompted them to retain counsel. Ultimately the Debtor obtained the near unanimous consent of his creditors to his Plan.

31

1   FL Receivables, with its general unsecured claim and the sole objector to confirmation, being the

2   notable exception.  Given these facts, the Court will allow the late filed ballot of QK, Inc.  The

3   Court concludes that the Debtor has an impaired consenting class to his Plan, with the Objection

4   of FL Receivables on this point being overruled.

6                  5. <u>Whether the Plan is feasible pursuant to § 1129(a)(11).</u>

7                  FL Receivables relies on Section 1129(a)(11) to support its position that the

8   Debtor's Plan is not feasible.  The Court has already discussed, <u>supra,</u> the different confirmation

9   standards that apply to an individual.  Although Section 1129(a)(11) has not been eliminated

10  from consideration when an individual debtor wishes to confirm a plan, Section 1129(a)(15)

11  specifically describes what burden of proof an individual debtor must meet to obtain

12  confirmation of a plan when an allowed unsecured claim objects to confirmation.  The Court has

13  already concluded that, from an evidentiary standpoint, the Debtor has met his burden of proof

14  under Section 1129(a)(15).  Thus, is there a reason for this Court to conclude that the Debtor

15  somehow has not met the burden of Section 1129(a)(11)?

16                 The Debtor proposes to liquidate his exempt and non-exempt property and to

17  devote his wages and the social security of his wife to his Plan payments.  In essence, the Debtor

18  proposes a plan of liquidation.  This is permissible under Section 1129(a)(11).  Although FL

19  Receivables ruminates over a variety of reasons as why the Plan is not feasible, the reality is that

20  it is as feasible as any plan proposed by an individual.  There are no guarantees, but this Debtor

21  proposes to liquidate substantially all of his assets to pay his creditors over a number of years.

22  Unfortunately, he has incurred substantial tax obligations which will necessitate that most of his

23  Plan payments will be made to reduce those claims.  However, such a proposal to reduce

24  dramatically or eliminate tax obligations, through the liquidation of assets and the use of wages,

25  is feasible.

26                 As to the concerns of FL Receivables that the Debtor is unable to pay off the

28                                              32

priority claim of the OTC within the period prescribed by the Bankruptcy Code, the Debtor has presented evidence at the October 26, 2009 hearing that the OTC claim has been reduced to only the sum of $40,000 and that it may be paid in full, since the IRS has agreed to defer certain payments on its claim. As to the concern that the Debtor has not carried his burden of proof to demonstrate that he is able to make the monthly payments proposed in the Plan, the Court concludes that the Debtor has provided sufficient evidence concerning the liquidation of exempt and non-exempt assets that it is reasonably likely that the Debtor will be able to make the payments as proposed. Moreover, the specific provisions of Section 1129(a)(15) indicate that the Debtor may always modify his Plan postconfirmation, if necessary, to make only those payments that are usually required for an individual debtor. Again, if the Debtor makes the payments as required under Section 1129(a)(15), and makes the payments as required under his proposed Plan, which is a liquidating plan, the Debtor has met the separate requirement of Section 1129(a)(11). Finally, as to the concern of FL Receivables that Mr. Ghaanati will not make a $75,000 cash contribution to the Plan, the Court concludes that sufficient evidence has been presented that Mr. Ghaanati will make the requisite payment. At trial, Mr. Ghaanati testified that he would use funds from his 401K account to make the requisite contribution. He also clarified that he intended to contribute roughly $62,250 toward confirmation, which he believed was the actual net amount to be paid, since he needed to withhold a certain amount from the $75,000 to pay his required tax obligation for the distribution.

As noted, the Debtor is not required to rely on third-party funding to confirm his Plan. In this case, the Debtor has chosen to do so to ensure that the taxing authorities are paid in a timely manner. The Court concludes that Mr. Ghaanati was a credible witness and that his cash contribution will allow the Debtor to confirm a feasible Plan. Based upon the foregoing, the Court concludes that the Debtor's Plan does meet the requirements of Section 1129(a)(11), and the Debtor has met his burden of proof thereunder. The Objection of FL Receivables is overruled as to Section 1129(a)(11).

33

## VI. CONCLUSION

FL Receivables, a general unsecured creditor of this individual Debtor, interposed the only objection to the confirmation of the Debtor's Plan. The Court has reviewed and considered the evidence presented by the parties at a contested confirmation hearing, as well as the cited legal authorities. Although the Court has sustained, in part, the FL Receivables Objection, the Court concludes that a portion of the Objection must be overruled. What has been overruled, in the FL Receivables' Objection, allows the Debtor to confirm his Plan. The Court concludes, as a matter of fact and law, that the Debtor has carried his burden of proof and that his Plan should be, and will be, confirmed. The Debtor shall present an order of confirmation that is consistent with this decision.

DATED this 23rd day of March, 2010.

Honorable Sarah Sharer Curley
United States Bankruptcy Judge

BNC to NOTICE

34